**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | |
| | ) | Criminal No. 21-105 |
| YARELIS GARCIA CORRETJER | ) | |
| REYELIN ABREU VASQUEZ, | ) | |
| | ) | |
| Defendants. | ) | |

**MEMORANDUM OPINION**

**I.    INTRODUCTION**

Presently before the Court are Motions to Suppress Evidence filed by Defendants Yarelis Garcia Corretjer ("Ms. Garcia") and Reyelin Abreu Vasquez ("Mr. Abreu").  (Docket Nos. 103, 115).  The Government filed Responses in opposition to the Motions, and the Court held a hearing on March 2, 2023, the official transcript of which was filed of record.  (Docket Nos. 107, 117, 120, 122).  At the Court's direction, on May 30, 2023, the parties submitted post-hearing proposed findings of fact and conclusions of law relative to Defendants' Motions.  (Docket Nos. 126, 127, 128).  No party filed a response to an opposing party's post-hearing submission by the established deadline of June 29, 2023, (*see* Docket No. 125), thus the Court then took the matter under advisement.  After careful consideration of the parties' submissions, the transcript of the proceedings and the credible evidence of record, and for the following reasons, Defendants' Motions will be denied.

## II.     BACKGROUND

### A.  Procedural History

On March 16, 2021, Defendants were charged in a two-count Indictment with conspiracy to possess with intent to distribute 400 grams or more of fentanyl, in violation of 21 U.S.C. § 846, and possession with intent to distribute 400 grams or more of fentanyl, in violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(A)(vi), both for conduct occurring on or about September 16, 2020. (Docket No. 43).  Defendants subsequently were arraigned and pled not guilty to the charges. (Docket Nos. 49, 53).

Following Defendants' arraignments, they requested and were granted a number of extensions of time to file pretrial motions.  Ultimately, Defendants filed Motions to Suppress Evidence,[1] which are opposed by the Government.  (Docket Nos. 103, 107, 115, 117).  As stated, the Court held a hearing on Defendants' suppression Motions, all supplemental briefing is complete, and the matter is now ripe for disposition.

### B.  Facts

At issue here is whether evidence that was obtained following a traffic stop of a vehicle driven by Ms. Garcia in which Mr. Abreu was a passenger should be suppressed, as both Defendants advocate.  At the suppression hearing, the Government called Pennsylvania State Police ("PSP") Trooper Glenn Adams, who testified concerning the events bearing on the matters at issue and was subject to cross-examination concerning same.  (*See* Docket Nos. 120, 122).  The Government also entered two exhibits into evidence: a video recording of Trooper Adams' Mobile Video Recorder ("MVR") from September 16, 2020 (hereinafter, "Ex. 1"); and a PSP Spanish

---

[1]     Ms. Garcia also filed a Motion for Discovery and a Motion to Produce Evidence the Government Intends to Use Under Federal Rules of Evidence 404(b) and 609, (Docket Nos. 113, 114), which the Court ruled on in an Order dated July 27, 2023.  (Docket No. 130).

consent to search form, which was provided to Ms. Garcia on that same date.  (Docket No. 120-1).

At a hearing on a motion to suppress, it is well-settled that "the credibility of the witnesses and the weight to be given the evidence, together with the inferences, deductions and conclusions to be drawn from the evidence, are all matters to be determined by the trial judge." *United States v. Richardson*, 501 F. Supp. 2d 724, 734 (W.D. Pa. 2007) (citations omitted).  To that end, as finder of fact, the Court "is free to accept or reject any or all of a witness's testimony." *United States v. Murphy*, 402 F. Supp. 2d 561, 569 (W.D. Pa. 2005) (citation omitted).   In this Court's estimation, based on Trooper Adams' demeanor and testimony in response to the questioning of the attorneys at the suppression hearing, he offered credible testimony concerning the events that unfolded on the date in question, despite the defense's efforts to impeach him.  *See United States v. Garcia*, 521 F. App'x 71, 73 (3d Cir. 2013) (quoting *Anderson v. City of Bessemer,* 470 U.S. 564, 575 (1985) (" '[w]hen findings are based on determinations regarding the credibility of witnesses . . . for only the trial judge can be aware of the variations in demeanor and tone of voice that bear so heavily on the listener's understanding of and belief in what is said.' ")).

In addition, Trooper Adams presented as an experienced law enforcement officer given that he has been employed by the PSP for approximately seven years and assigned to the PSP Bureau of Criminal Investigation Drug Enforcement Division Western SHIELD[2] unit for three years.  (Docket No. 122 at 6, 7).  The SHIELD unit is comprised of 18 troopers with training and experience in conducting criminal interdiction operations on Pennsylvania interstates involving narcotics, firearms, bulk amounts of United States currency, human trafficking, missing persons, wanted fugitives, and stolen fraudulent merchandise.  (*Id.* at 6-7).  In summary, Trooper Adams'

_____

2       SHIELD stands for Safe Highways Initiative through Effective Law Enforcement Detection.  (Docket No. 122 at 6).

law enforcement training consists of six months at the PSP Academy learning to be a trooper, 280 hours of specialized training relating to narcotics investigations and criminal interdiction, and a 40-hour SHIELD training course specific to criminal highway interdiction.  (*Id.* at 7-12, 14, 96).

Trooper Adams' SHIELD training included instruction on pre-stop indicators, which are "anything that can be seemingly innocent . . . but to a trained and experienced officer, when taken in the totality of the circumstances[,] could be an indicator of criminal activity."  (Docket No. 122 at 14, 15).  Pre-stop indicators can include nervous driving behavior, dark window tint, air fresheners in the vehicle, a very plain vehicle, or a newly registered vehicle.  (*Id.* at 15).

Trooper Adams' SHIELD training also addressed the manner in which drugs are smuggled in Pennsylvania, including information about source locations, source destinations, and drug corridors.  (Docket No. 122 at 15).  As Trooper Adams explained, large metropolitan cities such as Philadelphia, Pennsylvania, Newark, New Jersey and Bronx, New York are examples of a source origin for narcotics in the northeast section of the country.  (*Id*. at 16).  A source destination is a smaller city in the region that depends on those areas for its narcotics supply, such as Pittsburgh, Johnstown, and Erie, Pennsylvania.  (*Id.*).  A drug corridor is the most direct route between a source origin and a source destination.  (*Id.*).  For instance, the Pennsylvania Turnpike is a drug corridor[3] because it is the fastest and most efficient way for a vehicle to travel from Philadelphia to Pittsburgh.  (*Id.*).

In connection with Trooper Adams' SHIELD training, he also received instruction concerning deceptive or nervous behaviors, roadside interviews, locating aftermarket hidden compartments in vehicles, and third party use of vehicles.  (Docket No. 122 at 17-18).  As Trooper

---

3       Trooper Adams explained that the Pennsylvania Turnpike is more broadly a "smuggling corridor" because, in addition to drugs, human trafficking and the smuggling of stolen fraudulent merchandise and illegal aliens also occur on the Turnpike.  (Docket No. 122 at 21).

Adams explained, aftermarket hidden compartments, or traps, are concealed within a vehicle for the purpose of transporting illegal contraband. (*Id.* at 21-22). Third party use of vehicles means that the person driving the vehicle does not own it and/or does not know the vehicle's owner. (*Id.* at 18). According to Trooper Adams' training, drug trafficking organizations use third party vehicles to compartmentalize their operations, to offer the driver of the vehicle a built-in defense, and to thwart asset forfeiture proceedings if law enforcement interdicts the vehicle and recovers any contraband. (*Id.* at 18-19).

As for Trooper Adams' experience in these areas, he has participated in thousands of traffic stops in his career, he has been the lead investigator on approximately 100 criminal interdictions and drug-related investigations, and he has assisted on "upwards of 500." (Docket No. 122 at 22, 98). Trooper Adams has interdicted ten vehicles which contained aftermarket hidden compartments, and he has assisted "dozens of times" with other officers' investigations involving them. (*Id.* at 23).

Turning to the events of September 16, 2020, Trooper Adams was working as a member of the SHIELD unit in a fully marked PSP patrol vehicle located on the Turnpike westbound in Mount Pleasant Township. (Docket No. 122 at 23, 26-27, 78-79). At approximately 2:00 p.m. that day, Trooper Adams became involved in the traffic stop at issue in this case. (*Id.* at 24).

Trooper Adams' patrol vehicle is equipped with a MVR, which begins recording 30 seconds prior to when a trooper activates the vehicle's emergency lights. (Docket No. 122 at 24, 25, 26). A microphone clipped to Trooper Adams' uniform records the audio portion of the traffic stop. (*Id.* at 25). Trooper Adams explained that there are some limitations on what the MVR can capture because of its position in the vehicle, as opposed to what he can see in real time. (*Id.* at 26). Trooper Adams acknowledged that the MVR recording of the traffic stop at issue in this case

is an accurate depiction of what occurred.  (*Id.* at 24).

Trooper Adams' attention was drawn to a Chevy Impala because it had window tint which he believed violated Pennsylvania law,[4] as well as a temporary New Jersey registration.  (Docket No. 122 at 27-28, 80, 106, 118).  Based on Trooper Adams' SHIELD training, the temporary registration drew his attention because those are utilized by criminal organizations to thwart law enforcement's surveillance of a vehicle.  (*Id.* at 29-31).  More specifically, at that time, the PSP were unable to obtain information about a vehicle when running a New Jersey temporary registration through their computer system, such as its make, model, whether it was stolen, or whether the owner was wanted in connection with any crime.  (*Id.* at 29).

As Trooper Adams pulled into the lanes of travel to pursue the vehicle, he paced the vehicle for 3/10 of mile and observed that it was travelling 78 miles per hour, which was above the 70 mile per hour posted speed limit.  (Docket No. 122 at 32, 107).  Trooper Adams followed the vehicle for approximately 5 ½ miles in the right lane before pulling into the left lane.  (*Id.* at 107-08).  While following the vehicle, Trooper Adams noticed that it travelled close to the shoulder of the road and on or over the fog line.  (*Id.* at 33, 34).  Trooper Adams perceived this as nervous driving behavior based on his training in proxemics, or the amount of space an individual believes is necessary to place between himself and a perceived threat.  (*Id.* at 33-34).  In Trooper Adams' experience, the vehicle travelled over the fog lane in the right lane to create distance between it and his patrol vehicle in the left lane.  (*Id.* at 34).

In addition to the dark window tint, temporary registration and nervous driving behavior, Trooper Adams also observed that the vehicle was very plain and appeared to be five to ten years

---

4       According to Trooper Adams' testimony, under Pennsylvania law, window tint must allow at least 70% light transmittance.  (Docket No. 122 at 143).  Subsequent testing on the vehicle's windows revealed 32% light transmittance.  (*Id.*).

old, which is another pre-stop indicator based on his training and experience. (Docket No. 122 at 36, 79, 108-09, 110, 118). As Trooper Adams testified, drug trafficking organizations tend to utilize vehicles that blend in well with the innocent motoring public, thus the vehicles are often five to ten years old, they are not brightly colored, and they contain little to no exterior or interior personalization. (*Id.* at 36, 37, 79-80). Trooper Adams explained that the plain vehicles used by drug trafficking organizations are similar to company cars and typically have a single key in the ignition. (*Id.* at 37-38).

When Trooper Adams located a safe place along that particular portion of the Turnpike, he activated his lights and siren to initiate a traffic stop. (Docket No. 122 at 32, 108; Ex. 1 at :45 - :55). Upon approaching the vehicle, Trooper Adams observed a single key in the ignition and noticed that the vehicle did not contain interior personalization, other than multiple air fresheners, which are often placed in the vicinity of contraband in his experience. (Docket No. 122 at 36-38, 130). Additionally, Trooper Adams observed both the passenger and the driver making telephone calls. (*Id.* at 35-36, 86, 120). This was notable because the innocent motoring public typically hangs up the phone when Trooper Adams approaches and begins looking for their documents, whereas those engaged in criminal activity may place a phone call to notify someone that they have been stopped by the police. (*Id.* at 39). Trooper Adams also noticed multiple cell phones in the vehicle, which was significant because individuals involved in criminal activity often utilize multiple telephones to subvert surveillance. (*Id.* at 63).

Trooper Adams quickly detected a language barrier because the driver was speaking Spanish. (Docket No. 122 at 40, 85, 120; Ex. 1 at 1:46 - 1:50). Trooper Adams is not fluent in Spanish, but he knows basic Spanish as it relates to his job. (Docket No. 122 at 40-41, 85, 86). During the traffic stop, Trooper Adams  utilized his basic, work-related Spanish along with a

Google Translate application on his PSP issued cellular telephone to communicate with the vehicle's occupants. (*Id.* at 41, 85-86). Although the SHIELD unit has access to a translation service that the troopers can contact, Trooper Adams felt that he and the vehicle's occupants were communicating "pretty well," so it was unnecessary to utilize that service. (*Id.* at 102).

When Trooper Adams asked the driver of the vehicle, who he identified as Ms. Garcia, for her identification, she did not have any difficulty understanding him, as she supplied him with her driver's license. (Docket No. 122 at 41, 122-23). Trooper Adams identified Mr. Abreu as the passenger in the vehicle. (*Id.* at 41-42). Mr. Abreu was still on the phone, and Trooper Adams asked him to hang up. (*Id.* at 43; Ex. 1 at 2:30 – 2:33).

Trooper Adams then asked Ms. Garcia to step out of the vehicle so that they could effectively communicate at his patrol vehicle.[5] (Docket No. 122 at 42; Ex. 1 at 2:51 – 2:53). In Trooper Adams' estimation, Ms. Garcia did not appear confused because she exited the vehicle and walked directly to the passenger side window of his patrol vehicle as directed. (Docket No. 122 at 44, 55, 87, 122; Ex. 1 at 3:01 – 3:09). At that point, she began to laugh nervously. (Docket No. 122 at 44, 123-24).

Using the Google Translate application, Trooper Adams stated in English for Ms. Garcia to speak into it, to which she indicated her understanding before the application translated into Spanish what Trooper Adams had said. (Docket No. 122 at 47-48). Ms. Garcia did not appear confused when Trooper Adams informed her that he had pulled her over because of the window tint and speeding. (*Id.* at 49, 88). Still using Google Translate, Trooper Adams stated that he was going to issue Ms. Garcia a warning and not a citation, and she responded in English that was fine. (*Id.* at 48-49, 88, 122; Ex. 1 at 4:55 – 5:06).

---

5       As a matter of practice, Trooper Adams speaks to the vehicle's driver at the passenger side of his patrol vehicle in all traffic stops. (Docket No. 122 at 120).

Trooper Adams next inquired who owned the vehicle, and Ms. Garcia responded in English, "my cousin," but she was unable to supply the cousin's name.  (Docket No. 122 at 49-50, 89, 128, 130; Ex. 1 at 5:07 – 5:40).  Based on Trooper Adams' training and experience, Ms. Garcia's inability to provide the registered vehicle owner's name was significant because it indicated that she was operating a third party vehicle.  (Docket No. 122 at 50-51, 130).

Still using the Google Translate application, Trooper Adams requested that Ms. Garcia provide the vehicle's paperwork, and she complied.  (Docket No. 122 at 51-52; Ex. 1 at 5:42 – 6:12).  Ultimately, Trooper Adams learned that the vehicle was registered to Harrison Abreu Cortez in Philadelphia.  (Docket No. 122 at 131).  It was suspicious to Trooper Adams that the vehicle's owner, who was not present, was from Philadelphia, but the vehicle had a temporary New Jersey registration.  (*Id.*).  At this point, considering the totality of the circumstances, Trooper Adams believed reasonable suspicion existed that Defendants were involved in drug trafficking.  (*Id.* at 133).  According to Trooper Adams' police report of the traffic stop, he messaged his partner, Trooper Ryan Marmol, via his mobile data terminal and summoned him to the traffic stop to assist.  (Docket No. 131 at 11).

Trooper Adams then inquired in Spanish with Ms. Garcia concerning her travel plans, asking for her origin location and destination.  (Docket No. 122 at 52, 89; Ex. 1 at 6:22 – 6:37).  In Trooper Adams' estimation, Ms. Garcia understood what he was asking, as she responded Philadelphia and Pittsburgh, respectively.  (Docket No. 122 at 52, 54; Ex. 1 at 6:22 – 6:37).  Given Trooper Adams' training and experience, he was aware that Pittsburgh is a destination which relies on Philadelphia as a source of heroin and cocaine supply.  (Docket No. 122 at 52).  While Trooper Adams was discussing with Ms. Garcia her travel itinerary, he was simultaneously checking her driver's license and the vehicle's registration through the computer system in his patrol vehicle

and inputting information into the PSP's computer system to document the interaction.  (*Id.* at 53).  During this process, Ms. Garcia was not handcuffed or detained and remained standing at the passenger side window of Trooper Adams' patrol vehicle.  (*Id.* at 55).

Trooper Adams observed that Ms. Garcia appeared to be nervous and she also displayed deceptive behavior during their interaction as shown by her uncertainty where she was going to stay in Pittsburgh.  (Docket No. 122 at 55-56).  In Trooper Adams' training and experience, the innocent motoring public has definitive plans when they travel, whereas individuals engaged in narcotics smuggling oftentimes do not.  (*Id.* at 56-58).

At that point in the traffic stop, Trooper Adams returned to the vehicle to speak with Mr. Abreu, who was on the phone when Trooper Adams approached.  (Docket No. 122 at 60, 89; Ex. 1 at 10:40 – 11:00).  Using the Google Translate application, Trooper Adams asked Mr. Abreu questions concerning vehicle ownership and travel plans similar to those he had asked Ms. Garcia.  (Docket No. 122 at 60-61, 90, 135; Ex. 1 at 11:14 – 13:05).  It appeared to Trooper Adams that Mr. Abreu understood those questions because he provided context appropriate responses and did not visibly display any confusion.  (Docket No. 122 at 61).  Mr. Abreu did not provide the vehicle owner's name, but he responded that he was going to visit someone named Christian.  (*Id.*; Ex. 1 at 13:15).  Based on Trooper Adams' training and experience, it was relevant that Defendants provided conflicting responses concerning their travel plans.  (Docket No. 122 at 62).

At this time, Trooper Adams still was conducting some of the business of the traffic stop.  (Docket No. 122 at 63).  His MVR captured dinging sounds which were produced by the computer system in his patrol vehicle as information relative to the interaction was being documented in the system.  (*Id.* at 63-64).  When Trooper Adams then inquired with Ms. Garcia whether drugs or anything illegal was in the vehicle, he observed that she appeared to become excessively nervous.

10

(*Id.* at 64; Ex. 1 at 15:14 – 15:29).  Ms. Garcia's nervousness raised Trooper Adams' suspicion because, in his experience, a motorist's nervousness typically is dispelled after being informed that only a warning is being issued, which had already occurred here.  (Docket No. 122 at 64-65).

Using the Google Translate application, Trooper Adams asked Ms. Garcia for consent to search the vehicle, and she agreed but inquired whether a warrant was needed and asked how long a search would take.  (Docket No. 122 at 65-66; Ex. 1 at 15:32 – 16:29, 17:09 – 17:30).  Ms. Garcia spoke in Spanish and then said in English, "you can, it's fine."  (Docket No. 122 at 66; Ex. 1 at 16:30 – 16:31).  Given their exchange and Ms. Garcia's context appropriate responses, Trooper Adams believed that Ms. Garcia understood that he asked to search the vehicle.  (Docket No. 122 at 66).  However, to ensure Ms. Garcia's understanding, Trooper Adams asked her multiple times if he could search the vehicle, and she indicated in the affirmative.  (*Id.* at 67, 92; Ex. 1 at 16:33 – 17:08, 17:30 – 17:40).

At this point, Trooper Marmol arrived at the scene to assist with the search, and he gave Trooper Adams a PSP Spanish consent to search form.  (Docket No. 122 at 67-68, 92).  Trooper Adams testified concerning Government Exhibit 2, which is the PSP Spanish consent to search form he provided to Ms. Garcia.  (Docket Nos. 115-1; 120-1; 122 at 68-69, 93).  Without using the Google Translate application, Trooper Adams pointed to the form and asked Ms. Garcia to read it.  (Docket No. 122 at 139; Ex. 1 at 20:02).  Ms. Garcia read the form aloud and did not appear to have any difficulty doing so or understanding what she read, but Trooper Adams did not ask if she had any questions about the form.  (Docket No. 122 at 69, 137, 140-41; Ex. 1 at 20:03 – 21:40).  Trooper Adams indicated that Ms. Garcia should check the box on the form that was appropriate for her circumstance.  (Docket No. 122 at 69).  Trooper Adams also stated in English, "[i]f [si], sign right there."  (*Id.* at 93, 140; Ex. 1 at 21:46 – 21:57).  Ms. Garcia decided which box

to check and signed the form.  (Docket No. 122 at 69).  In light of the corresponding English consent to search form, Trooper Adams' understanding is that the box Ms. Garcia checked specified, "[w]ith permission of the owner, I have equal access and control to the artifacts, vehicles and area to be searched."  (*Id.* at 70).  Accordingly, Trooper Adams believed that he had both verbal and written consent from Ms. Garcia to search the vehicle.  (*Id.* at 69-70, 142).

When Trooper Adams initiated the vehicle search, both Defendants were seated on the hillside behind and away from his patrol vehicle.  (Docket No. 122 at 72).  They were not handcuffed or physically detained.  (*Id.*).  During the search, Trooper Adams and Trooper Marmol located an aftermarket compartment.  (*Id.* at 73, 74; Ex. 1 at 26:35).  After locating the compartment, Trooper Adams administered *Miranda* warnings to Defendants by reading a Spanish *Miranda* card and then providing the card to Defendants to read.  (Docket No. 122 at 76-77; Ex. 1 at 28:05 – 29:08).  Trooper Adams asked Defendants if they understood, and they affirmed that they did.  (Docket No. 122 at 77; Ex. 1 at 30:06 – 30:13).

Trooper Adams asked Mr. Abreu if he could open the compartment, but eventually Trooper Adams was able to open it.  (Docket No. 122 at 78; Ex. 1 at 30:28 – 30:36).  The troopers found 16 packages containing a heroin-fentanyl mixture in the compartment.  (Docket No. 122 at 73).  At that point, Trooper Adams advised Defendants that they would be charged with possession with intent to distribute a controlled substance.  (*Id.* at 78; Ex. 1 at 41:09 – 41:13).

## III.   **DEFENDANTS' MOTIONS TO SUPPRESS EVIDENCE**

Ms. Garcia contends that the search of the vehicle she was operating was unlawful because the traffic stop was unreasonably extended.  (Docket Nos. 115 at 4-6; 126 at 7-18).  Mr. Abreu also contends that the search was unlawful for that reason.  (Docket Nos. 103 at 4-6; 128 at 10-17).  Furthermore, Ms. Garcia maintains that she did not voluntarily consent to a search of the

vehicle.  (Docket Nos. 115 at 6-8; 126 at 19-22).  Mr. Abreu asserts that he had a reasonable expectation of privacy in the vehicle sufficient to confer standing to challenge the vehicle search, and he echoes the contention that consent to search was involuntary.  (Docket Nos. 103 at 2; 128 at 18-19).  Additionally, both Defendants argue that they were subjected to custodial interrogation without having received *Miranda* warnings, thus any statements they made at the scene of the traffic stop were not voluntary and should be suppressed.  (Docket Nos. 103 at 7-10; 115 at 8-9; 126 at 19-20; 128 at 20-21).  Defendants also seek to suppress any other evidence the Government intends to use which was obtained as fruit of the alleged tainted encounter.  (Docket Nos. 103 at 11; 115 at 9).

The Government counters that suppression is not warranted for any of the reasons advanced by Defendants.  According to the Government, the vehicle stop was not impermissibly extended because Trooper Adams had reasonable suspicion to extend and expand the scope of the stop.  (Docket Nos. 107 at 5-9; 117 at 5-9; 127 at 9-11).  The Government further submits that the vehicle search was lawful because Ms. Garcia provided valid verbal and written consent to search.  (Docket Nos. 117 at 10-15; 127 at 11-15).  However, as a passenger in the vehicle, Mr. Abreu did not demonstrate a reasonable expectation of privacy in the vehicle and thus cannot challenge the search of it.  (Docket No. 107 at 11-12).  Further, *Miranda* warnings were not initially necessary because Defendants were not in custody until the aftermarket compartment was discovered in the vehicle.  (Docket Nos. 107 at 10-11; 117 at 16-17; 127 at 15).  After that point, Defendants were read *Miranda* warnings and also given a Spanish *Miranda* warning card to read.  (Docket Nos. 107 at 11; 117 at 17; 127 at 15-16).  Thus, any subsequent statements by Defendants are not subject to suppression.  (Docket Nos. 107 at 11; 117 at 17).

13

For reasons that follow, the Court finds that suppression of the evidence seized from the vehicle Ms. Garcia was operating on September 16, 2020 is not warranted because no Fourth Amendment violation occurred. Likewise, suppression of any statements made by Defendants during the traffic stop is not warranted because no Fifth Amendment violation occurred.

### A.  Legal Standard -  Fourth Amendment

The Fourth Amendment protects citizens against unreasonable searches and seizures. U.S. CONST. amend. IV. In order to suppress evidence, the defendant has the burden of establishing that his Fourth Amendment rights were violated. *United States v. Acosta*, 965 F.2d 1248, 1256 n.9 (3d Cir. 1992). "However, once the defendant has established a basis for his motion, *i.e.*, the search or seizure was conducted without a warrant, the burden shifts to the government to show that the search or seizure was reasonable." *United States v. Johnson*, 63 F.3d 242, 245 (3d Cir. 1995) (citation omitted). The burden of proof is preponderance of the evidence. *United States v. Mastronardo*, 987 F. Supp. 2d 569, 575 (E.D. Pa. 2013) (citing *United States v. Matlock*, 415 U.S. 164, 178 n.14 (1974)).

Here, it is undisputed that the troopers searched the vehicle without a warrant. Therefore, it is the Government's burden to show by a preponderance of the evidence that the initial stop and investigative detention of Defendants and the subsequent search of the vehicle were reasonable. For reasons that follow, the Court finds that the Government has sustained its burden.

### B.  The Traffic Stop Was Lawful[6]

The Fourth Amendment permits a traffic stop based on reasonable suspicion that a traffic

---

6        "A traffic stop necessarily curtails the travel a passenger has chosen just as much as it halts the driver. . . ." *Brendlin v. California*, 551 U.S. 249, 257 (2007). Consequently, a traffic stop is a seizure of everyone in the stopped vehicle. *See Delaware v. Prouse*, 440 U.S. 648, 653 (1979). For this reason, both a driver and a passenger have standing to challenge the stop of a vehicle. *See Brendlin*, 551 U.S. at 258-59 (holding that a passenger of an automobile that was pulled over by the police for a traffic stop was entitled to challenge constitutionality of that stop); *United States v. Mosley*, 454 F.3d 249, 253 (3d Cir. 2006) (holding that passengers have standing to object to a vehicle stop). Accordingly, both Ms. Garcia and Mr. Abreu have standing to challenge the traffic stop involved in this case.

violation has occurred regardless of the officer's subjective motivations for making the stop. *See United States v. Delfin-Colina*, 464 F.3d 392, 397 (3d Cir. 2006) ("[T]he . . . reasonable suspicion standard applies to routine traffic stops."); *Mosley*, 454 F.3d at 252 ("[T]he Supreme Court established a bright-line rule that any technical violation of a traffic code legitimizes a stop, even if the stop is merely pretext for an investigation of some other crime."). Therefore, "a traffic stop will be deemed a reasonable 'seizure' when an objective review of the facts shows that an officer possessed specific, articulable facts that an individual was violating a traffic law at the time of the stop." *Delfin-Colina*, 464 F.3d at 398. Moreover, "an officer need not be factually accurate in her belief that a traffic law had been violated but, instead, need only produce facts establishing that she reasonably believed that a violation had taken place." *Id.*

As relevant here, reasonable suspicion exists to justify a traffic stop when a vehicle has dark tinted windows in violation of Pennsylvania law. *See United States v. Johnson*, 452 F. App'x 219, 225 (3d Cir. 2011); *United States v. Gooch*, 915 F. Supp. 2d 690, 704 (W.D. Pa. 2012) (finding vehicle stop was based on reasonable suspicion where trooper who was experienced in highway interdiction credibly testified that he observed heavy tint on driver's side windows as the vehicle passed him going the speed limit even though he was in a minimally lit area at night time). Additionally, driving in excess of the posted speed limit in violation of Pennsylvania law also provides reasonable suspicion to make a traffic stop. *See United States v. Green*, 897 F.3d 173, 178 (3d Cir. 2018) (finding reasonable suspicion for a traffic stop where trooper paced defendant's vehicle and estimated his speed at 79 miles per hour, 14 miles per hour above posted limit).

Trooper Adams' testimony establishes that he reasonably believed the window tint on the vehicle driven by Ms. Garcia violated Pennsylvania law. (Docket No. 122 at 27-28, 143). On that basis alone, Trooper Adams had reasonable suspicion to conduct a traffic stop of the vehicle.

Trooper Adams also testified that he paced the vehicle travelling 78 miles per hour, 8 miles per hour above the posted speed limited. (*Id.* at 32, 107). The Court accepts as credible Trooper Adams' testimony concerning the dark window tint and speeding and concludes that the traffic stop was lawful because it was based on Trooper Adams' reasonable suspicion that he observed two traffic violations.[7]

### C. **The Traffic Stop Was Not Unlawfully Extended**

A traffic stop that is lawful at its inception "can become unlawful if it is prolonged beyond the time reasonably required to complete th[e] mission" of addressing the traffic violation that warranted the stop. *Illinois v. Caballes*, 543 U.S. 405, 407 (2005). In executing the mission of a traffic stop, an officer may check the driver's license, determine whether there are outstanding warrants against the driver, and inspect the vehicle's registration and proof of insurance. *Rodriguez v. United States*, 575 U.S. 348, 355 (2015). Such inquiries are permissible because they serve the purpose of the traffic stop, that is, ensuring roadway safety. *Id.* In addition, the Third Circuit Court of Appeals has held that "some questions relating to a driver's travel plans ordinarily fall within the scope of the traffic stop, as do delays caused by safety concerns related to the stop." *United States v. Garner*, 961 F.3d 264, 271 (3d Cir. 2020) (citing *United States v. Givan*, 320 F.3d 452, 459 (3d Cir. 2003)).

While an officer "may conduct certain unrelated checks during an otherwise lawful traffic stop . . . he may not do so in a way that prolongs the stop, absent the reasonable suspicion ordinarily demanded to justify detaining an individual." *Rodriguez*, 575 U.S. at 355. A traffic stop is unreasonably extended when an officer, without reasonable suspicion, diverts from a stop's traffic-

---

7       Defendants do not dispute that Trooper Adams possessed reasonable suspicion to execute the traffic stop. *See* Docket No. 103 at 2, n.2 (stating Mr. Abreu "does not challenge the initial stop for speeding and sun screening…"); *see generally* Docket No. 115 (wherein Ms. Garcia does not contend reasonable suspicion to conduct traffic stop was lacking).

based purpose to investigate other crimes. *Id.* at 354-55; s*ee also Green,* 897 F.3d at 179. However, an officer may "expand the scope of a traffic stop and detain the vehicle and its occupants for further investigation if [the officer] 'develops a reasonable, articulable suspicion of criminal activity.'" *United States v. Frierson*, 611 F. App'x 82, 85 (3d Cir. 2015) (quoting *Givan*, 320 F.3d at 458).

There is no dispute that the traffic stop at issue was extended beyond the time necessary to address the traffic violations that precipitated the stop to include an investigation which culminated in the search of the Chevy Impala and the arrest of Defendants. However, it is disputed when extension of the traffic stop occurred, and whether, at that moment, Trooper Adams possessed reasonable suspicion in order to justify the extension. In light of *Rodriguez*, it is first necessary to determine when the stop was "measurably extend[ed]" longer than necessary to effectuate its traffic-based purpose. *Rodriguez*, 575 U.S. at 355 (quoting *Arizona v. Johnson*, 555 U.S. 323, 333 (2009)). After determining when the stop was extended - the "*Rodriguez* moment," - it is then necessary to assess whether the facts available to Trooper Adams at that time were sufficient to establish reasonable suspicion that Defendants were involved in drug trafficking. *Green,* 897 F.3d at 179.

Not surprisingly, the parties disagree when the *Rodriguez* moment occurred in this case. The Government submits that the *Rodriguez* moment occurred approximately 6 minutes and 8 seconds into the MVR video recording when Ms. Garcia produced the vehicle registration. (Docket No. 127 at 8). According to the Government, Trooper Adams still was effectuating the routine business of the traffic stop at that time, but he also had developed reasonable suspicion that criminal activity was afoot based on his training and experience. (*Id.* at 9-11). Mr. Abreu seems to suggest that the *Rodriguez* moment occurred just after Ms. Garcia gave Trooper Adams the

17

vehicle registration, that is, when Trooper Adams contacted Trooper Marmol because he believed the vehicle contained contraband and intended to search it.  (*See* Docket No. 128 at 17).  However, Mr. Abreu disagrees that Trooper Adams possessed reasonable suspicion at that time to extend the traffic stop.  (*See id.*).  In Ms. Garcia's estimation, the traffic-related purpose for the stop was satisfied at an earlier point in the encounter when Trooper Adams advised that he was going to issue her a warning for her traffic infractions, and she replied that was fine.  (Docket Nos. 115 at 4; 126 at 16).  Ms. Garcia maintains that Trooper Adams did not possess reasonable suspicion that criminality was afoot at that juncture, thus everything which took place thereafter was an illegal extension of the stop.  (Docket No. 126 at 16).

The Court does not agree with Ms. Garcia concerning the moment the traffic-based purpose of the stop was satisfied, given that Trooper Adams still had not completed checking the vehicle's registration at that time.  *See Rodriguez*, 575 U.S. at 355 ("an officer's mission includes ordinary inquiries incident to [the traffic] stop . . . [including] inspecting the automobile's registration") (internal quotation marks and citation omitted).  However, calling for backup to assist in a vehicle search, as Trooper Adams did here after Ms. Garcia produced the vehicle registration, is "a measure aimed at detect[ing] evidence of ordinary criminal wrongdoing."  *Id.* (internal quotation marks and citation omitted).  In the Court's estimation, at that point, Trooper Adams diverted from the stop's traffic-based purpose to pursue investigation of another crime.

Accordingly, the Court next considers whether Trooper Adams had developed reasonable suspicion at that point in the traffic stop that Defendants were involved in drug trafficking.  To evaluate whether reasonable suspicion exists, "a court must consider the totality of the circumstances, in light of the officer's experience."  *Givan*, 320 F.3d at 458.

In this case, from the moment Trooper Adams observed the vehicle in which Defendants

were travelling on the Pennsylvania Turnpike until Ms. Garcia produced the vehicle's registration, Trooper Adams observed multiple indicators of drug trafficking that, taken together and viewed through the lens of his criminal highway interdiction training and experience, provided him with reasonable suspicion to extend the stop beyond the traffic violations that initiated it.  Those factors included the following: (1) the vehicle had dark window tint, which is common on vehicles used to transport illegal contraband; (2) the vehicle had a temporary registration, which is utilized by criminal organizations to thwart law enforcement's surveillance of a vehicle; (3) the vehicle was travelling on the Pennsylvania Turnpike, which is a known drug corridor; (4) the driver of the vehicle exhibited nervous driving behavior by travelling close to the shoulder of the road and on or over the fog line; (5) the vehicle was very plain and appeared to be five to ten years old, which is the type of vehicle drug trafficking organizations tend to utilize in order to blend in well with the innocent motoring public; (6) when Trooper Adams approached, both the passenger and driver were making telephone calls, which is not uncommon when individuals are engaged in criminal activity, whereas the innocent motoring public typically hangs up the phone and begins looking for their documents when an officer approaches; (7) there was a single key in the ignition, which often signifies a third-party vehicle used by individuals who smuggle contraband; (8) the vehicle did not contain interior personalization, other than multiple air fresheners in the vehicle, which are often placed in the vicinity of contraband; (9) there were multiple cell phones in the vehicle, which are often utilized by individuals engaged in criminal activity to subvert surveillance; (10) after exiting the vehicle, Ms. Garcia laughed nervously as she stood next to Trooper Adams' patrol vehicle; (11) Ms. Garcia indicated that her cousin owned the vehicle, but she was unable to provide the cousin's name, which signified that she was operating a third-party vehicle; (12) the vehicle was registered to Harrison Abreu Cortez in Philadelphia, yet the vehicle had a temporary New

Jersey registration; and (13) Philadelphia is a source origin city for narcotics.[8] (Docket No. 122 at 16, 27-28, 33-38, 44, 49-50, 63, 79, 80, 86, 89, 106, 108-09, 110, 118, 120, 123-24, 128, 130, 131).

Any one of the foregoing factors in isolation would not necessarily create reasonable suspicion of criminal activity. Taken together and considered in light of Trooper Adams' training and experience in highway interdiction, those factors provided him with reasonable suspicion at the *Rodriguez* moment to conclude that Defendants were involved in criminal activity, which justified extension of the traffic stop for further investigation.[9] *See Garner*, 961 F.3d at 271-72 (reasonable suspicion existed to extend traffic stop where rental vehicle did not display typical bar code stickers on windshield; vehicle was travelling on known drug trafficking corridor; air fresheners were present in vehicle; and defendants seemed extremely nervous throughout stop); *United States v. Robinson*, 529 F. App'x 134, 138 (3d Cir. 2013) (reasonable suspicion justified extension of traffic stop where, *inter alia*, the following factors were present: vehicle was travelling on Pennsylvania Turnpike where drug trafficking was prevalent; odor of air fresheners in vehicle; multiple cell phone in vehicle; third-party ownership of vehicle; and discrepancies between state where defendant's driver's license was issued and state where vehicle was

---

[8]     Even assuming the earlier *Rodriguez* moment advanced by Ms. Garcia, Trooper Adams had observed factors (1) through (10) by that time. Given same, the Court still would conclude that the presence of those factors taken together and viewed in light of Trooper Adams' criminal highway interdiction training and experience provided him with reasonable suspicion that criminal activity was afoot.

[9]     After the *Rodriguez* moment, Trooper Adams permissibly inquired with Ms. Garcia about her travel plans, given that such questions ordinarily fall within the scope of a traffic stop. *See Garner*, 961 F.3d at 271; *Givan*, 320 F.3d at 459. Trooper Adams' suspicion was further heightened when he learned that Ms. Garcia was travelling from Philadelphia to Pittsburgh, as those cities are source origin and source destination cities for narcotics, respectively. (Docket No. 122 at 52, 89). Further, Ms. Garcia was uncertain where she was going to stay in Pittsburgh, which was suspicious to Trooper Adams because, based on his training and experience, the innocent motoring public typically has definitive plans when they travel. (*Id.* at 55-58). Trooper Adams' suspicion increased further when he received conflicting answers from Mr. Abreu in response to similar questions (posed with the aid of Google Translate) about ownership of the vehicle and travel plans. (*Id.* at 60-62, 90, 135). Although Mr. Abreu did not provide the vehicle owner's name, he responded that he was going to visit someone named Christian. (*Id.* at 61). Given that Mr. Abreu provided context appropriate responses and did not display any visible confusion, it appeared to Trooper Adams that he understood what had been asked of him. (*Id.*).

registered); *United States v. West*, 103 F. App'x 460, 462 (3d Cir. 2004) (explaining that nervous behavior accompanied by other conduct could establish reasonable suspicion); *United States v. Meran*, Crim. No. 16-222, 2017 WL 4803927, at *9 (W.D. Pa. Oct. 23, 2017) (finding reasonable suspicion justifying extension of traffic stop where, *inter alia*, the following factors were present: dark window tint; vehicle travelling on known drug corridor; driver's inability to identify vehicle owner's last name; discrepancies between vehicle's registration and driver's license; single key in ignition; and air fresheners in vehicle).

### D.  Standing to Challenge Vehicle Search

The Government does not contest that Ms. Garcia has standing to challenge the vehicle search.[10]  However, the Government contends that Mr. Abreu, as a passenger in the vehicle, did not demonstrate a reasonable expectation of privacy in it and thus cannot challenge the vehicle search.  (Docket No. 107 at 11-12).  Mr. Abreu disagrees.  (Docket Nos. 103 at 2).

The Fourth Amendment right to be free from unreasonable searches and seizures is a personal right and a defendant must establish standing in order to assert that right.[11]  *See United States v. Padilla*, 508 U.S. 77, 81-82 (1993).  "An individual challenging a search has the burden of establishing that he had a reasonable expectation of privacy in the property searched and the

---

10      According to Trooper Adams' testimony, Ms. Garcia indicated that her cousin owned the vehicle, and he found that it was registered to Harrison Abreu Cortez in Philadelphia.  (Docket No. 122 at 49-50, 130, 131).  In light of this testimony, and given that there is no evidence of record indicating the vehicle was stolen, the Court concludes that Ms. Garcia has standing to challenge the search of the vehicle because she apparently borrowed it from a relative and had lawful possession of it.  *See United States v. Baker*, 221 F.3d 438, 442 (3d Cir. 2000) (standing to challenge vehicle search existed where the defendant borrowed car from a friend and drove it for a number of weeks; although it was somewhat vague who owned car, there was no evidence in record that it was stolen); *Meran*, 2017 WL 4803927, at *9-10 (finding that the defendant had standing to challenge vehicle search where he possessed the vehicle with the consent of his friend who owned it, he had control over it for a day, and there was no evidence it was stolen); *United States v. Jones*, Crim. No. 16-27, 2017 WL 1190501, at *4 (W.D. Pa. Mar. 31, 2017) (determining that the defendant had standing to challenge vehicle search because he was the sole occupant of the vehicle, he obtained possession of it with his cousin's consent, he exercised exclusive control over it for several hours, and there was no evidence that it was stolen).

11      "[S]tanding in the Fourth Amendment context is shorthand for a legitimate expectation of privacy."  *United States v. Jackson*, 849 F.3d 540, 550 n.7 (3d Cir. 2017) (internal quotation marks and citation omitted).

item seized." *United States v. Burnett*, 773 F.3d 122, 131 (3d Cir. 2014) (citation omitted). "A person must show both that he had a subjective expectation of privacy in the area searched and that his expectation was objectively reasonable." *Id.* In order for a defendant to demonstrate that he had a subjective expectation of privacy, he must show that he "took normal precautions to maintain his privacy." *Id.* (citation omitted).

In light of these principles, it is well settled that "a passenger in a car that he neither owns nor leases typically has no standing to challenge a search of the car." *Burnett*, 773 F.3d at 131 (quoting *Baker*, 221 F.3d at 441–42). Although Mr. Abreu broadly claims that he "had the consent of the vehicle's owner to be in possession of and to operate the vehicle that [Ms. Garcia] was operating on September 16, 2020," (Docket No. 103 at 2), he points to no record evidence to substantiate this claim, and he otherwise has failed to demonstrate that he had an objectively reasonable expectation of privacy in the vehicle. To reiterate, "[p]assengers in cars, unlike owners or licensees, have no reasonable expectation of privacy in the interior of the vehicle in which they are riding." *Mosley*, 454 F.3d at 252-53. Moreover, Mr. Abreu did not manifest a subjective expectation of privacy in the vehicle. He has pointed to no evidence indicating that he took steps to maintain his privacy in the borrowed vehicle, nor has he shown that he did anything to indicate that he objected to the search of the vehicle. *See United States v. Anderson*, 859 F.2d 1171, 1177 (3d Cir. 1988) ("[I]t is uncontroverted that while the car was being searched, [defendant] stood by and watched without objection. Such behavior is completely inconsistent with the contention that [he] retained an expectation of privacy."). Consequently, Mr. Abreu lacks standing to challenge the search of the vehicle. However, even if Mr. Abreu had standing to challenge the vehicle search, the Court still would deny his Motion to Suppress to the extent it is based on Ms. Garcia's supposed involuntary consent because the Court finds that her consent to search the vehicle was voluntary

for reasons explained below.

### E.  <u>Ms. Garcia Voluntarily Consented to a Search of the Vehicle</u>

Ms. Garcia contends that she did not voluntarily consent to a search of the vehicle.  (Docket Nos. 115 at 6-8; 126 at 19-22).  The thrust of Ms. Garcia's lack of consent argument is that a language barrier existed which was not overcome by Trooper Adams' use of the Google Translate application, and her supposed consent came amidst an unduly coercive situation and an unlawful custodial interrogation.  (*See id.*).  Contrary to Ms. Garcia's contentions, the Government has sustained its burden to prove by a preponderance of the evidence that she voluntarily consented verbally and in writing to a search of the vehicle.  *See United States v. Velasquez*, 885 F.2d 1076, 1081 (3d Cir. 1989) ("The government has the burden of proving by a preponderance of the evidence that the search was made pursuant to a voluntary consent.") (citations omitted); *see also United States v. Price*, 558 F.3d 270, 277 (3d Cir. 2009) ("To justify a search based on consent, the Government 'has the burden of proving that the consent was, in fact, freely and voluntarily given.' ") (quoting *Bumper v. North Carolina*, 391 U.S. 543, 548 (1968)).

"A voluntarily given consent is an exception to the search warrant requirement and is therefore constitutionally permissible."  *Velasquez*, 885 F.2d at 1081 (citing *Schneckloth v. Bustamonte*, 412 U.S. 218 (1973)).  An analysis of whether consent was voluntary is based on the totality of the circumstances.  *See Schneckloth*, 412 U.S. at 227. The analysis involves consideration of "the characteristics of the accused and the details of the interrogation;" however, a case should not "turn[ ] on the presence or absence of a single controlling criterion."  *Id.* at 226; *see also United States v. Kim*, 27 F.3d 947, 955 (3d Cir. 1994) ("[W]hether consent was given is to be resolved by examining all relevant factors, without giving dispositive effect to any single criterion.").  Factors to consider include: the age, education and intelligence of the defendant;

whether he was advised about his constitutional rights; the length of the detention; the repetition or duration of the questioning; and the use of physical punishment. *Schneckloth*, 412 U.S. at 226; *Price*, 558 F.3d at 278. The Court of Appeals for the Third Circuit also identified as relevant "the setting in which the consent was obtained [and] the parties' verbal and non-verbal actions." *Price*, 558 F.3d at 278 (quoting *Givan*, 320 F.2d at 459). Finally, "[w]hile knowledge of the right to refuse consent is one factor to be taken into account, the government need not establish such knowledge as the *sine qua non* of an effective consent." *Schneckloth*, 412 U.S. at 227. In view of the totality of the circumstances in this case, the Court concludes that Ms. Garcia's consent to search the vehicle was freely and voluntarily given.

Initially, although a language barrier was present, that fact alone does not preclude a finding that Ms. Garcia's consent was voluntary. To that end, "[n]umerous courts have found that a defendant's consent to search was voluntary despite the existence of a language limitation." *Meran*, 2017 WL 4803927, at *12 (citing *United States v. Valdez*, 147 F. App'x 591, 596 (6th Cir. 2005) (the defendant's command of English, though tenuous, was sufficient to permit him to give voluntary consent to search vehicle where he readily complied with officer's request to produce driver's license and he appropriately responded to questions about his destination and relationship with the passenger); *United States v. Cedano-Medina*, 366 F.3d 682, 686-87 (8th Cir. 2004) (finding consent to search voluntary, despite language barrier between the defendant and police officer and apparent lapses that occurred during their conversation, where the defendant provided license and registration upon request, answered questions about his trip and displayed nonchalant attitude during search); *United States v. Zubia-Melendez*, 263 F.3d 1155, 1163 (10th Cir. 2001) (affirming district court's finding that the defendant and police officer "could converse sufficiently to understand one another" despite "acknowledge[ing] that [the defendant] has trouble speaking

and understanding English" and that "the videotape of the traffic stop demonstrates his confusion at several points during the encounter"); *United States v. Zapata*, 180 F.3d 1237, 1242 (11th Cir. 1999) (finding that the defendant's purported limitation understanding English did not preclude him from providing voluntary consent to search minivan where he was able to answer questions regarding travel plans and twice gave consent to search); *United States v. Sanchez-Valderuten*, 11 F.3d 985, 990-91 (10th Cir. 1993) (affirming district court's finding that the defendant voluntarily consented to vehicle search, despite difficulty speaking English, his short or single word responses and failure to respond to some questions; the defendant immediately produced license and registration upon request and responded to questions concerning his travel plans and where he was raised); *United States v. Massac*, 867 F.2d 174, 177 (3d Cir. 1989) (finding consent to search suitcase was voluntary where the defendant, who was a native of Haiti and had limited familiarity with English, had spent several years living in Delaware, possessed a Delaware driver's license and had an evolving ability to understand English)).

Similar to these cases, it is clear that a language barrier existed and that Ms. Garcia's primary language was Spanish, not English.  (Docket No. 122 at 40, 85, 120).  Nevertheless, Ms. Garcia's language limitation did not preclude her from understanding Trooper Adams' inquiries during their exchange.  First, the communications between Trooper Adams and Ms. Garcia were aided by his basic knowledge of Spanish as it relates to his job and his use of the Google Translate application[12] on his PSP issued cellular telephone.  (*Id.* at 41, 85-86).  In Trooper Adams'

---

[12]     Defendants point out that some courts have determined the Google Translate application is unreliable because its translations can produce "literal but nonsensical" translations that can cause confusion.  *See* Docket Nos. 115 at 6; 126 at 21 (citing *United States v. Cruz-Zamora*, 318 F. Supp. 3d 1264, 1267 (D. Kan. 2018)); *see also* Docket No. 103 at 1, n.1) (citing *United States v. Ramirez-Mendoza*, No. 4:20-CR-00107, 2021 WL 4502266, at *6 (M.D. Pa. Oct. 1, 2021) (finding that Google Translate did not accurately translate officer's request for consent to search into Spanish)).  Conversely, however, other courts have found that Google Translate facilitates effective communication when a language barrier exists.  *See e.g., United States v. Ceja-Torres*, Crim. No. 3:21-CR-141, 2022 WL 9936376, at *6 (W.D. Ky. Oct. 17, 2022).  In the present matter, the Court is not persuaded that Trooper Adams' use of the Google Translate application caused confusion in his interaction with Ms. Garcia such that her consent to search was

estimation, he and Ms. Garcia were communicating "pretty well" aided by that application, thus he did not feel it was necessary to utilize a translation service. (*Id.*).

The interaction between Trooper Adams and Ms. Garcia demonstrates that she understood and appropriately responded to his requests and inquiries. For instance, Ms. Garcia produced her driver's license upon Trooper Adams' request and she complied with Trooper Adams' request to exit the vehicle. (Docket No. 122 at 41, 42, 44, 123). When Trooper Adams requested that Ms. Garcia speak into the Google Translate application, she indicated that she understood what to do before the application translated his request into Spanish. (*Id.* at 47-48). Through use of the application, Trooper Adams informed Ms. Garcia why he had stopped the vehicle and that he was going to issue her a warning and, without expressing confusion, she responded in English that was fine. (*Id.* at 48-49, 88). Ms. Garcia also provided context appropriate responses to Trooper Adams' inquiries concerning who owned the vehicle (her cousin) and her travel plans (travelling from Philadelphia to Pittsburgh). (*Id.* at 52, 54). Additionally, Ms. Garcia provided Trooper Adams with the vehicle's registration when he requested it. (*Id.* at 51-52).

When Trooper Adams asked Ms. Garcia for consent to search the vehicle, she responded, "you can, it's fine," but inquired whether a warrant was needed and how long a search would take. (Docket No. 122 at 65-66; Ex. 1 at 15:32 – 16:31, 17:09 – 17:30). Trooper Adams viewed Ms. Garcia's context-appropriate response as indicating that she understood what was being asked. (Docket No. 122 at 66). To ensure Ms. Garcia understood, Trooper Adams asked multiple times, and Ms. Garcia indicated in the affirmative. (*Id.* at 67, 92; Ex. 1 at 16:33 – 17:08, 17:30 – 17:40).

Although there were lapses in the conversation between Trooper Adams and Ms. Garcia,

---

rendered involuntary. As thoroughly discussed above, Ms. Garcia articulated context appropriate responses to Trooper Adams' questions posed through Google Translate. Any difficulty that the parties encountered while using Google Translate is outweighed by the overall context of their interaction and the numerous other indicia of voluntariness discussed above.

the foregoing summary of their exchange shows that she understood and appropriately responded to Trooper Adams' inquiries and requests.  *See Valdez*, 147 F. App'x at 596 ("In determining whether an individual has sufficient comprehension of English to provide voluntary consent, courts examine his ability to interact intelligently with the police.") (quoting *Zapata*, 180 F.3d at 1242)). Despite Ms. Garcia's language limitation, the Court finds that she could sufficiently understand Trooper Adams' inquiries based on her ability to answer the questions posed to her.

Ms. Garcia's understanding of her interaction with Trooper Adams is further shown by the fact that she executed a PSP Spanish written consent to search form.  (Docket Nos. 115-1; 120-1; 122 at 68-69, 93).  Although Trooper Adams did not use the Google Translate application, he pointed to the form and asked Ms. Garcia to read it.  (Docket No. 122 at 139; Ex. 1 at 20:02).  Ms. Garcia read the form aloud and did not appear to have any difficulty doing so or understanding what she read, but Trooper Adams acknowledged that he did not ask if she had any questions about the form.  (Docket No. 122 at 69, 137, 140-41; Ex. 1 at 20:03 – 21:40).  Trooper Adams indicated that Ms. Garcia should check the box on the form that was appropriate for her circumstance, and also stated in English, "[i]f [si], sign right there."  (Docket No. 122 at 69, 93, 140; Ex. 1 at 21:46 – 21:57).  Ms. Garcia decided which box to check and signed the form.  (Docket No. 122 at 69). In light of the corresponding English consent to search form, Trooper Adams' understanding is that the box Ms. Garcia checked specified, "[w]ith permission of the owner, I have equal access and control to the artifacts, vehicles and area to be searched."  (*Id.* at 70).

All told, Ms. Garcia's ability to comply with Trooper Adams' requests and provide context appropriate responses to his questions are strong indicators that she sufficiently understood Trooper Adams to have given voluntary verbal consent to search.  Her voluntary consent is further shown by the fact that she executed a Spanish written consent to search form after reading it aloud

and displaying no confusion concerning its contents. *See Ramirez-Mendoza*, 2021 WL 4502266, at *6, n.93 (noting that the "gold standard" for any interaction with a language barrier is a "foreign-language consent form which the defendant reads and signs"). There is no indication in the record that Ms. Garcia was confused, surprised or expressed any objection when Trooper Adams began to search – facts that would suggest she did not realize what she had consented to. The record otherwise discloses nothing about Ms. Garcia's age, education or intelligence that adversely affected her ability to provide voluntary consent, and the other salient factors which are addressed next further demonstrate that her consent was voluntary.

Trooper Adams sought Ms. Garcia's consent to search the vehicle approximately 16 minutes after he initiated the traffic stop. (Docket No. 122 at 65; Ex. 1 at 15:32 – 16:29). Accordingly, Ms. Garcia was not detained for a lengthy period of time prior to providing consent. *See Meran*, 2017 WL 4803927, at *15 (finding that detention was not lengthy where trooper solicited consent to search and the defendant provided same 12 minutes after traffic stop was initiated). Trooper Adams' request to search was direct, and Ms. Garcia did not hesitate to respond or seem reluctant to provide consent. (Docket No. 122 at 65-66). To ensure that Ms. Garcia understood, Trooper Adams asked her multiple times if he could search the vehicle, and she indicated in the affirmative. (*Id.* at 67, 92; Ex. 1 at 16:33 – 17:08, 17:30 – 17:40). Nothing from their exchange indicates that Trooper Adams pressured Ms. Garcia to consent to the search. Further, there is no evidence that Trooper Adams used any physical force, drew his weapon, or coerced or threatened Ms. Garcia in any way to obtain her consent to the search. Ms. Garcia was not restrained prior to providing consent to search, and she was permitted to sit next to Mr. Abreu, without handcuffs, on a hillside behind and away from Trooper Adams' patrol vehicle during the search. (Docket No. 122 at 72).

Although Trooper Adams obtained Ms. Garcia's consent at the scene of a traffic stop along a highway, which could be a stressful situation for any motorist, the recording from Trooper Adams' MVR confirms that the interaction between Ms. Garcia and him was cordial.  *See Velasquez*, 885 F.2d at 1082 (finding no coercion when "consent took place on the shoulder of a major highway during daylight hours").  Overall, both Trooper Adams' and Ms. Garcia's actions during the exchange indicate that her consent was voluntary.  *See Price*, 558 F.3d at 278 (recognizing that a relevant factor is "the setting in which the consent was obtained [and] the parties' verbal and non-verbal actions").

While the record does not reflect that Trooper Adams advised Ms. Garcia that she could refuse giving him consent to search the vehicle, that factor alone is not dispositive.  *See Schneckloth*, 412 U.S. at 227 (knowledge of the right to refuse consent is not the *sine qua non* of an effective consent).  Given the totality of the circumstances present here, the Court finds that Ms. Garcia voluntarily consented to the search of the vehicle, even though she was not advised of her right to refuse consent.  *See Meran*, 2017 WL 4803927, at *16 (finding that the defendant's consent to search vehicle was voluntary, despite that he was not advised of his right to refuse consent).

Finally, Mr. Abreu criticized Trooper Adams' use of the Google Translate application instead of seeking the assistance of an interpreter at the scene of the traffic stop.  (*See* Docket No. 128 at 19).  Although Trooper Adams conceded that the SHIELD unit has access to a translation service that the troopers can contact, he felt that was unnecessary because he and the vehicle's occupants were communicating "pretty well."  (Docket No. 122 at 102).  While it is conceivable that Trooper Adams could have contacted an interpreter, given the totality of the circumstances, his decision not to do so does not undermine the finding that Ms. Garcia's "consent was the product

of a voluntary and unconstrained choice." *Meran*, 2017 WL 4803927, at *16 (determining that trooper's failure to use a Spanish written consent form or seek assistance of another trooper who could speak to the defendant in Spanish did not undermine finding that the defendant voluntarily provided verbal consent to search vehicle). Accordingly, because Ms. Garcia voluntarily consented to a search of the vehicle, suppression of evidence recovered from the search is not warranted.

### F.  Legal Standard – Fifth Amendment

The Fifth Amendment provides that "[n]o person shall be . . . compelled in any criminal case to be a witness against himself." U.S. CONST. amend. V. Consequently, a defendant who "has been taken into custody or otherwise deprived of his freedom of action in any significant way" must be given the warnings prescribed in *Miranda v. Arizona*, 384 U.S. 436, 444 (1966). These warnings are required because custodial interrogation involves "inherently compelling pressures." *Id.* at 467.

Under *Miranda*, "a statement made by a suspect in response to custodial interrogation after he or she has elected to remain silent is inadmissible at trial." *United States v. Brownlee*, 454 F.3d 131, 146 (3d Cir. 2006). However, "the special procedural safeguards outlined in *Miranda*" are required only where a suspect is taken into custody and "subjected to interrogation." *Rhode Island v. Innis*, 446 U.S. 291, 300 (1980). Interrogation means "express questioning or its functional equivalent . . . any words or actions on the part of police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect." *Brownlee*, 454 F.3d at 146 (quoting *Innis*, 446 U.S. at 300-01). "Any statement given freely and voluntarily without any compelling influences is, of course, admissible in evidence." *Innis*, 446 U.S. at 299-300 (quoting *Miranda*, 384 U.S. at 478).

When a defendant seeks to suppress statements, he satisfies his initial burden "if he alleges that he was subjected to custodial questioning without the benefit of *Miranda* warnings, at which point the government must prove by a preponderance of the evidence that there was no custodial interrogation implicating *Miranda*, there was some exception to the *Miranda* rule, or . . . [the defendant] . . . was properly *Mirandized* and waived his rights." *United States v. Valenta*, Crim. No. 15-161, 2017 WL 2131375, at *4 (W.D. Pa. May 17, 2017) (internal quotation mark and citation omitted).

### G.  No Miranda Violation Occurred

Here, both Defendants allege that they were subjected to custodial interrogation from the outset of the traffic stop without having received *Miranda* warnings, thus any statements they made at the scene of the roadside stop were not voluntary and should be suppressed.  (Docket Nos. 103 at 7-10; 115 at 8-9; 126 at 19-20; 128 at 20-21).  The Government contends that *Miranda* warnings were not initially necessary because Defendants were not in custody.  (Docket Nos. 107 at 10-11; 117 at 16-17; 127 at 15).  When the aftermarket compartment was discovered in the vehicle, Defendants were administered *Miranda* warnings in Spanish and also were given a Spanish *Miranda* card to read, thus any subsequent statements are not subject to suppression. (Docket Nos. 107 at 11; 117 at 17; 127 at 15-16).  For reasons next explained, the Court finds that the Government has sustained its burden of establishing by a preponderance of the evidence that *Miranda* was not implicated until the aftermarket compartment was discovered, at which point Defendants were properly *Mirandized*.

A person is in custody for *Miranda* purposes when "there is a 'formal arrest or restraint on freedom of movement' of the degree associated with a formal arrest."  *Maryland v. Shatzer*, 559 U.S. 98, 112 (2010) (quoting *New York v. Quarles*, 467 U.S. 649, 655 (1984)).  If a person has not

been formally arrested when the statements in question are made, "something must be said or done by the authorities, either in their manner of approach or in the tone or extent of their questioning, which indicates that they would not have heeded a request to depart or to allow the suspect to do so." *Steigler v. Anderson*, 496 F.2d 793, 799 (3d Cir. 1974).

"[T]he initial determination of custody depends on the objective circumstances of the interrogation, not on the subjective views harbored by the interrogating officers or the person being questioned." *Stansbury v. California*, 511 U.S. 318, 323 (1994). The question is whether, under the totality of the circumstances, "a reasonable person [would] have felt he or she was not at liberty to terminate the interrogation and leave." *Thompson v. Keohane*, 516 U.S. 99, 112 (1995). The Third Circuit Court of Appeals has identified the following objective factors to consider: whether the officers told the suspect that he was under arrest or free to leave; the location of the interrogation; the length of the interrogation; whether officers used coercive tactics such as a hostile tone of voice, the display of weapons or physical restraint; and whether the suspect voluntarily submitted to questioning. *United States v. Willaman*, 437 F.3d 354, 359-60 (3d Cir. 2006) (citations omitted).

As stated, Defendants contend that they were subject to custodial interrogation from the outset of the traffic stop. They are incorrect. "The Supreme Court has held that the questioning of a motorist detained pursuant to a routine traffic stop does not constitute custodial interrogation for *Miranda* purposes." *Meran*, 2017 WL 4803927, at *19 (citing *Berkemer v. McCarty*, 468 U.S. 420, 440 (1984); *Anderson*, 859 F.2d at 1177 ("[T]he roadside questioning of a motorist detained pursuant to a routine traffic stop is not custodial in nature and a *Miranda* warning is not required.")). Therefore, Trooper Adams was not required to give Defendants *Miranda* warnings prior to posing questions concerning the traffic stop and requesting their identifying information

and vehicle registration.

As discussed above, Trooper Adams developed reasonable suspicion that Defendants were involved in criminal activity, which justified extension of the stop for further investigation and ultimately resulted in a search of the vehicle.  During that period, there is no indication that Defendants were in custody for *Miranda* purposes.  Although Trooper Adams did not tell Defendants that they were free to leave, he did not advise them that they were under arrest.  *See Willaman*, 437 F.3d at 359.  Defendants were on the side of the highway during daylight hours, and the entire stop had only been taking place for approximately 24 minutes by the time the search was commenced.  (Docket No. 122 at 72); *Willaman*, 437 F.3d at 359; *see also United States v. Carabello*, 643 F. App'x 163, 169 (3d Cir. 2016) ("The afternoon traffic stop was relatively brief and occurred in public—the same features found in *Berkemer* to mitigate the danger that a person questioned will be induced to speak where he would not otherwise do so freely.") (internal quotation marks and citation omitted).  Trooper Adams and Trooper Marmol did not interact with Defendants in a hostile or coercive manner, or display their weapons at any point, and Defendants were not handcuffed or restrained in any manner.  *Willaman*, 437 F.3d at 359-60.  In addition, Ms. Garcia voluntarily consented to a search of the vehicle during this period, which further demonstrates that the surrounding circumstances were not hostile.  For these reasons, *Miranda* warnings were not required while Trooper Adams conducted additional investigation and searched the vehicle at the scene of the traffic stop.  Consequently, any statements Defendants made related to the traffic stop and while Trooper Adams conducted additional investigation and searched the vehicle are not subject to suppression.

After locating the aftermarket compartment during the vehicle search, Trooper Adams administered *Miranda* warnings to Defendants by reading from a card the warning in Spanish and

then providing the card to Defendants to read.  (Docket No. 122 at 76-77; Ex. 1 at 28:05 – 29:08).

Trooper Adams asked Defendants if they understood, and they affirmed that they did.  (Docket

No. 122 at 77; Ex. 1 at 30:06 – 30:13).  Trooper Adams asked Mr. Abreu if he could open the

compartment, but eventually Trooper Adams was able to open it.  (Docket No. 122 at 78; Ex. 1 at

30:28 – 30:36).  After discovering narcotics in the compartment, Trooper Adams advised

Defendants that they would be charged with possession with intent to distribute a controlled

substance.  (Docket No. 122 at 73, 78; Ex. 1 at 41:09 – 41:13).  At that point Defendants were in

custody for *Miranda* purposes.  As stated, *Miranda* warnings had already been administered;

however, the record does not reflect that Defendants were subject to interrogation at the scene after

that point.[13]

## IV.   <u>CONCLUSION</u>

In summary, Trooper Adams had reasonable suspicion to conduct a traffic stop of the

vehicle in which Defendants were travelling on September 16, 2020.  As of the *Rodriguez* moment,

Trooper Adams had developed reasonable suspicion to believe that Defendants were involved in

drug trafficking, which justified extension of the traffic stop for further investigation.  In response

to Trooper Adams' request to search the vehicle, Ms. Garcia knowingly and voluntarily provided

both verbal and written consent to search.  Defendants were not initially in custody at the scene of

the traffic stop, thus no *Miranda* warnings were required.  However, upon locating an aftermarket

compartment in the vehicle, Trooper Adams administered *Miranda* warnings in Spanish to

Defendants, and they also were provided a Spanish *Miranda* card to read.  Defendants affirmed

---

13     As the Government notes in its briefing papers, Defendants do not challenge any statements they may have made when they subsequently were transported to the PSP barracks.  (Docket Nos. 107 at 11; 117 at 22).  However, the Government notes that Defendants were provided with *Miranda* warnings at the scene of the traffic stop and again, through an interpreter, prior to speaking with law enforcement at the barracks.  (Docket Nos. 107 at 11; 117 at 22). According to the Government, Ms. Garcia then requested a lawyer and no interrogation occurred.  (Docket No. 117 at 22).  There is no information in the record before the Court indicating whether Mr. Abreu was interrogated at the barracks.

that they understood; however, the record does not reflect that Defendants were further questioned at the scene.  For all of these reasons, Defendants' Motions to Suppress Evidence, (Docket Nos. 103, 115), are denied.

An appropriate Order follows.

_s/ W. Scott Hardy_
W. Scott Hardy
United States District Judge

Date:  <u>August 3, 2023</u>

cc/ecf:  All counsel of record